**UNITED STATES of America,**
**Plaintiff,**

v.

**TATE & LYLE NORTH AMERICAN SUGARS, INC., Defendant.**

**No. 97 CIV.9113 (RMB).**

United States District Court,
S.D. New York.

Aug. 28, 2002.

Order Issued Sept. 20, 2002.

Order Supplemented Sept. 25, 2002.

**310**

Jonathan Jackel, Burt Manel & Miller, Washington, DC, for defendants.

Sheila M. Gowan, Assist. U.S. Atty., U.S. Attorney's Office, New York City, for plaintiff.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BERMAN, District Judge.

## I. Introduction

 On or about December 10, 1997, plaintiff the United States of America ("Plaintiff" or the "IRS" or the "Government") commenced this action, "seek[ing] to recover a $1,526,100.60 interest payment it made to defendant Tate & Lyle North American Sugars, Inc., successor to Domino Sugar Corporation, formerly known as Amstar Sugar Corporation . . ., when the [IRS] returned a remittance that Amstar sent the IRS in December 1990."[1] Pre–Trial Memorandum of Law of Plaintiff United States ("Pl.Mem."), dated April 25, 2002, at 1–2; *see also* Complaint ("Compl.") ¶ 33. On December 14, 1990, Amstar remitted $6,497,710.00 to the IRS (the "December 1990 remittance"), which—as a result of adjustments in the taxpayer's favor—the IRS returned on September 28, 1993, with interest (the "September 1993 check"). The IRS contends that the September 1993 check mistakenly included the $1.526.100.60 which it now seeks; that the basis of the mistake was that the December 1990 remittance was a cash bond; and that "[i]t is well established that a taxpayer is not entitled to interest on a cash bond if it is returned by the IRS."[2] Pl. Mem. at 2. Defendants argue, among other things, that the IRS treated the December 1990 remittance as a payment of tax, Defendants' Pre–Trial Memorandum ("Def.Mem."), dated May 25, 2002, at 4; that "Amstar treated the [December 1990 remittance] as a payment of tax," *Id.;* that Amstar did not authorize anyone to designate the December 1990 remittance as a cash bond, Def. Mem. at 3; and that "Amstar did not want to give the [G]overnment an interest-free loan."[3] Def. Mem. at 10.

---

1. The IRS returned the funds to Amstar Sugar Corporation ("Amstar"), which was succeeded by Domino Sugar Corporation ("Domino"). *See* Compl. ¶ 10; Answer ¶ 10. Domino has since changed its name to Tate & Lyle North American Sugars, Inc. *See* Answer ¶ 1. By Order dated March 31, 2000, the Court substituted Tate & Lyle North American Sugars, Inc. ("Defendant" or "Tate & Lyle") for Domino as the defendant in this action. Tate & Lyle, Inc. ("TLI") is the parent company of Tate & Lyle. *See* Answer ¶ 7.

2. A cash bond is a remittance made by a taxpayer to the IRS "when no assessment [of tax liability] is then outstanding against the taxpayer." *Rosenman v. United States*, 323

U.S. 658, 662, 65 S.Ct. 536, 89 L.Ed. 535 (1945). A cash bond "stop[s] the running of interest on any amount subsequently assessed as a deficiency." *Callaway v. Comm'r*, 231 F.3d 106, 113 n. 11 (2d Cir.2000) (citing Rev. Proc. 84–58, 1984–2 C.B. 501, 502–03). "Such a deposit is not subject to a claim for credit or refund as an overpayment; the taxpayer may request its return at any time before the IRS is entitled to assess the tax; and it will be returned without interest." *Id.; see also* Rev. Proc. 84–58 at § 5.04.

3. A payment of tax is made by a taxpayer to the IRS "in satisfaction of a tax liability." Rev. Proc. 84–58 at § 2.03. A payment of tax,

The central issue in this case is whether Amstar's December 1990 remittance was a cash bond or a payment of tax. The case was tried before the Court without a jury, commencing on June 18, 2002 and concluding on June 19, 2002. At trial, the parties presented stipulations of fact, written exhibits, and witness testimony (both oral and by deposition). The Court had the opportunity to assess the demeanor and credibility of the witnesses which—because the parties presented starkly different versions of what occurred and what was intended—is crucial in this case.

The evidence presented during the trial established the following, among other things, by a preponderance of the evidence:

1. The December 1990 remittance was legally and factually a cash bond.

2. The December 1990 remittance was identified as a "cash bond" in the transmittal letter forwarding the check to the IRS.

3. The transmittal letter, dated December 14, 1990, was signed by Jared Twenty ("Twenty"), the Director of Taxes for TLI's U.S. subsidiaries and an employee of A.E. Staley Manufacturing Company ("Staley"), a "sister subsidiary" of Amstar.

4. Twenty testified that he was motivated in making the December 1990 remittance to stop interest from accruing (which is the function of a cash bond).

5. Twenty and his predecessor as Director of Taxes for TLI's U.S. subsidiaries, William Carnie ("Carnie"), specifically discussed making a deposit in the nature of a cash bond—before the December 1990 remittance was actually made—with Car-

ol Robbins ("Robbins"), a Revenue Agent for the IRS who was working on the Amstar account.

6. Robbins testified that she believes that Carnie clearly knew what a cash bond was and that he understood the implications of making a deposit in the nature of a cash bond. She also testified that she believes that, while Twenty may not have understood fully different technical options, he discussed the cash bond option with her and with others at Amstar and its related entities, or perhaps with attorneys from Burt, Maner & Miller ("BM & M") (outside counsel whom Twenty contacted daily for tax advice), before making the December 1990 remittance. Robbins also believed that Twenty certainly did understand that the December 1990 remittance would stop interest from accruing.

7. Robbins, on behalf of the IRS, treated, and intended to treat, the December 1990 remittance as a cash bond.

8. No one from the taxpayer side ever advised the IRS that the December 1990 remittance was not a cash bond or that Twenty was not authorized to characterize and make the December 1990 remittance as a cash bond until after the IRS advised the taxpayer that interest had been paid inadvertently on the cash bond and requested the return of the interest payment.

**For the reasons set forth herein, judgment will be entered in favor of the Government against Tate & Lyle in the amount of $1,526,100.60.[4]**

---

unlike a cash bond, is returned to the taxpayer with interest. *See* 26 U.S.C. § 6611.

4. *See* discussion *infra* pp. 325–26 regarding interest.

Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 52(a), the Court's findings of fact and conclusions of law follow:

## II. Findings of Fact

1. "On December 22, 1988, [Refined Sugars Incorporated ('RSI') ] acquired all of the stock of Amstar." Stip. Facts ¶ 4.[5] "Immediately after the acquisition, RSI merged into Amstar, with Amstar as the surviving corporation." *Id.* at ¶ 7.

2. On August 16, 1989, Amstar became an affiliated company of TLI, the corporate parent (and owner) of several companies in the United States (collectively, the "Tate & Lyle Group" or the "TLI Affiliated Group"). *See id.* at ¶¶ 6, 8.

3. On June 15, 1990, Amstar filed a federal income tax return which included its taxable income for the period prior to affiliation with the Tate & Lyle Group, *i.e.,* December 23, 1988 through August 16, 1989 (the "8908 return"). *See id.* at ¶¶ 10–11. "After the tax period ending August 16, 1989, Amstar filed its federal tax returns as part of the consolidated federal income tax returns for the TLI Affiliated Group." *Id.* at ¶ 12.

4. "In March 1990, the IRS Springfield, Illinois District Office issued an audit plan for the [Tate & Lyle Group's] consolidated income tax returns" for 1984, 1985, 1986, and 1987. *Id.* at ¶¶ 14, 18. "RSI was an affiliate of the Tate & Lyle [G]roup during the years covered by this audit . . . ." *Id.* at ¶ 15. "At the request of the Tate & Lyle [G]roup, the audits . . . were performed in Illinois by the IRS Springfield District [O]ffice." *Id.* at ¶ 24. To carry out the audit, "[t]he TLI Affiliated Group provided the IRS with an office in the Decatur, Illinois building of TLI Affiliated Group member Staley." *Id.* at ¶ 25.

5. "Amstar's 8908 tax return was not included" in the March 1990 audit plan. *Id.* at ¶ 17. While investigating a "RSI net operating loss that was reported on the Tate & Lyle [G]roup return," *id.* at ¶ 28, the IRS "learned about the Amstar 8908 return and asked for a copy of it." *Id.* at ¶ 29.

6. Carnie was employed by Staley from 1977 through 1990. *See* deposition of William Carnie, dated March 8, 2000 ("Carnie Dep.") at 6:7–7:4. Carnie was the Director of Taxes for Staley until 1988, when TLI acquired Staley. *See id.* at 10:3–4. At that time, Carnie became the Director of Taxes for the Tate & Lyle Group. *See id.* at 10:4–11. Carnie testified at his deposition that "the Staley Tax Group then became . . . the tax group that worked for the Tate & Lyle U.S. Group," *id.* at 11:21–12:1, which, beginning August 16, 1989, included Amstar. *See* Stip. Facts ¶ 8. At trial, Carnie was described as "tax-oriented" and "a tax professional." Tr. at 125:9–14.

7. Carnie and his assistant Martha Hoyt ("Hoyt") were primarily responsible for coordinating audits of the Tate & Lyle Group (which included Amstar) with the IRS. *See* Carnie Dep. at 23:21–24:24; Stip. Facts ¶ 8. Carnie was "responsible for . . . dealing with the IRS. Whatever the IRS wanted done, his job was to get it

**5.** References to "Stip. Facts" are to the stipulated facts contained in the Joint Consolidated Pre–Trial Order submitted by the parties on or about April 23, 2002; references to "Tr." are to the trial transcript; and references to "JE" are to the Joint Trial Exhibits submitted by the parties.

fixed, plus deal with any issues that would have arisen, he and his staff." Deposition of John Hunter, dated March 23, 2000 ("Hunter Dep.") at 72:6–9.

8. "As of the fall of 1989, the Tate & Lyle [G]roup tax department was the focal point for communications with the IRS." Stip. Facts ¶ 23. Joseph Kelly ("Kelly"), the Treasurer of Amstar from December 1988 to June 1998, *see* Tr. at 31:21–23, confirmed that "Amstar relied on the Tate & Lyle tax group to communicate with the IRS ...." *Id.* at 36:13–14. Indeed, the "Tate & Lyle tax group ... in Decatur was the means for [Amstar] to communicate with the IRS on [its] audit issues." *Id.* at 34:19–22.

9. Robbins worked on the audit of the TLI Affiliated Group from June 1989 to September 1991. *See* Declaration of V. Carol Robbins, dated April 22, 2002 ("Robbins Decl.") ¶ 1. During this time, Robbins became the IRS Team Coordinator for the audit and was primarily responsible "to direct the other team members, conduct the examination and develop the issues that were identified by the IRS." *Id.*

10. Carnie and Robbins spoke regularly about the audit, *i.e.*, "two or three times a week [when the IRS was] working in the Staley office building." Carnie Dep. at 35:19–20.

11. In August 1990, the IRS determined that Amstar's 8908 return showed that a deduction had been taken in the amount of $18,009,489.00, which represented an RSI net operating loss ("NOL"). *See* Stip. Facts ¶¶ 30–31. At the same time, "the RSI net operating loss [already] had been utilized on the Tate & Lyle [G]roup return or carried back to prior years' returns for the consolidated group [and] there was no loss available to carry forward onto other returns." *Id.* at ¶ 27. Thus, the RSI net operating loss was claimed erroneously by both the Tate & Lyle Group and Amstar on its 8908 return. *See* Robbins Decl. ¶ 6.

12. "As soon as [Robbins] learned about the two deductions for the same loss, [she] brought them to ... Carnie's attention and told him that [she] thought that they presented a problem." *Id.* at ¶ 7. Robbins and Carnie agreed "that an error had been made," *id.* at ¶ 8, and "no one ever asserted that Amstar was entitled to the $18 million NOL deduction ...." Tr. at 209:22–23.

13. As a result of the error, Amstar Sugar Corporation believed it "had a tax deficiency of more than $6 million." Def. Mem. at 2. Robbins and Carnie "discussed the alternatives available to [Amstar]" to resolve the problem, Robbins Decl. ¶ 9, and Carnie informed her "that he was concerned about stopping the interest from running on any deficiency that might be created by the adjustment." *Id.* at ¶ 10. Robbins and Carnie "had multiple discussions where [Carnie's] main concern was whether or not to let the adjustment sit there until the next [audit] cycle or whether or not to file an amended return." Tr. at 211:25–212:3. Robbins consulted with her supervisor, Donald Werner ("Werner"), *see* Robbins Decl. ¶ 11, and determined "that, since [the IRS] had not issued a Revenue Agent's Report for Amstar's 8908 return or performed an audit, the IRS could accept a cash bond from the taxpayer which would ... stop interest from running." *Id.* at ¶ 12. Robbins suggested to Carnie two options: "post[ing] a cash bond to stop the interest from

running," Tr. at 212:4–5, or "fil[ing] an amended return." *Id.* at 212:14. Robbins was persuaded that Carnie understood these options. *See id.* at 217:14–20. Robbins and Carnie had "multiple conversations" about a cash bond as one of Amstar's options. *See id.* at 213:6–15. During these conversations, Robbins learned that Carnie wanted to incorporate Amstar's New York tax people into the decision-making. *See id.* at 217:4—218:2. Carnie "eventually [told Robbins that] he wanted to post a cash bond," *id.* at 211:16–17, and to stop the interest from running. **"[I]t was [Robbins'] understanding that [Carnie] preferred to go ahead and just make a [deposit] in the form of a cash bond . . . ."** *Id.* at 214:13–15 (emphasis added).

14. "On August 14, 1990, [Robbins] told . . . Carnie in writing that Amstar could file an amended tax return for the 8908 period or make a deposit in the nature of a cash bond." Robbins Decl. ¶ 13; *see also* JE 5a. The following day, "[Robbins], along with other IRS team members, met with . . . Carnie and . . . Hoyt to discuss several matters, including the possible payment of a cash bond . . . ." Robbins Decl. ¶ 14. The IRS's case visitation notes state, "Robbins discussed the possible payment of a bond by [the taxpayer] to stop the interest. [The taxpayer] may be interested in doing so . . . ." JE 6.

15. "Based on [the IRS's] discussion with . . . Carnie, it was decided that the IRS would issue a notice of proposed adjustment for the 8908 year, the taxpayer would make a deposit [in the nature of a cash bond] to stop the interest from running," and the IRS would audit Amstar's 8908 return at a later time. *See* Robbins Decl. ¶ 15.

At Carnie's request, Robbins issued a notice of proposed adjustment on August 27, 1990. *See* Tr. at 216:24–217:9; Robbins Decl. ¶ 17; JE 7.

16. In November 1990, Twenty succeeded Carnie as Director of Taxes for the Tate & Lyle Group and served in that capacity until September 1991. *See* Stip. Facts ¶¶ 46, 48; Tr. at 98:16–18. Like Carnie, Twenty was an employee of Staley, not of Amstar. *See* Stip. Facts ¶¶ 49, 50. John Hunter ("Hunter"), the Vice–President and Chief Financial Officer at Staley and a director of TLI, *see* Hunter Dep. at 15:21–16:16, brought Twenty to the Decatur, Illinois audit site and introduced Twenty to Robbins and other members of the IRS audit team. *See* Robbins Decl. ¶ 21. "Hunter introduced . . . Twenty as the new Director of Tax, and told [the members of the IRS audit team] that [they] were to direct all matters to [Twenty]." *Id.*

17. After Twenty was appointed Director of Taxes, "he was [Robbins'] primary contact, just as . . . Carnie was before him. [The IRS] audit team had the same kinds of interactions with . . . Twenty as the team had with . . . Carnie when he was the Tax Director." *Id.* at ¶ 25.

18. Twenty earned a bachelor's degree in marketing from Milken University in Decatur, Illinois and a masters of business administration ("MBA"), with a specialization in finance, from Northern Illinois University. *See* Tr. at 102:8–15.

19. Harvey Friedman, Esq. ("Friedman"), was hired by Amstar as Senior Tax Counsel in July 1989 and held that position until 1998 when he assumed the role of General Attorney

at Domino.[6] *See* Friedman Dep. at 14:12–16:2; Tr. at 18:23–19:3. After Friedman joined Amstar, he had diminishing responsibility for tax matters because "general tax responsibilities were transferred to Decatur[,] Illinois, the Staley tax department in Decatur ... around 1991 ...." Friedman Dep. at 16:16–17:6. Indeed, Friedman testified that "Amstar [and] Domino ... did not have any direct contact with the [Internal] Revenue Service. Everything was handled through the Staley people ... [because] [t]hat was the administrative procedure that was set up by the company." Friedman Dep. at 72:22–73:15; *see also* Tr. at 24:18–25:6. According to Friedman. Twenty discussed Amstar tax issues directly with the IRS because **Twenty "was the representative of the company with the IRS, and he [supplied] information."** Tr. at 26:16–17 (emphasis added); *see also* Friedman Dep. at 82:24–25; JE 19.

20. On November 9, 1990, Robbins (and other members of the IRS audit team) met with Twenty, Hoyt and attorneys from BM & M, including name partner Daniel Burt, Esq. ("Burt"), to discuss matters relating to the ongoing audit of the Tate & Lyle Group in Decatur, Illinois. *See* Robbins Decl. ¶ 22. **Twenty consulted BM & M attorneys "daily" for advice on tax issues.** *See* Stip. Facts ¶ 52. During the meeting, Burt informed Robbins and the other members of the IRS audit team that "Hunter and ... Twenty were in control" of the audit issues. *See* Robbins Decl. ¶ 22.

21. On December 11, 1990, Twenty, Hoyt, and two attorneys from BM & M met in the Staley offices in Decatur, Illinois to discuss, among other things, tax issues. *See* Stip. Facts ¶ 67. Friedman participated by telephone in those parts of the conference pertaining to Amstar. *See id.*

22. On December 12, 1990, Bruce Welikson ("Welikson"), an analyst in the Tate & Lyle Group tax department, sent Friedman calculations regarding the proposed adjustment for the RSI net operating loss. *See id.* at ¶ 69. To arrive at the amount to be paid to the IRS, Welikson multiplied the RSI net operating loss "by Amstar's 34% tax rate ... and then [added] interest for the period 6/15/90 through 12/14/90," resulting in the amount of $6,497,710.00. *See id.* at ¶ 70.

23. Twenty informed Robbins "in advance that he was going to have a check for [her] relating to the RSI net operating loss deduction, and that he would deliver the check on a particular day." Robbins Decl. ¶ 26. Robbins recalls that, in the course of conversations she had with Twenty after he was appointed Director of Taxes, he told her "they were going to go ahead and pay" the IRS in the form of a "cash bond." *See* Tr. at 218:17–219:6. Robbins believed that Twenty "had talked about [designating the December 1990 remittance as a cash bond] with somebody, because he was checking everything out .... he wasn't independently making all these decisions." *Id.* at 219:11–13.

24. Based on Twenty's representation, Robbins gave the IRS teller unit in Springfield, Illinois advance warning

---

6. *See* deposition of Harvey Friedman, dated December 30, 1999 ("Friedman Dep."), at 13:22–24 ("Domino Sugar Corporation was known as Amstar Sugar Corporation when I started and it was in July of 1989.").

that the IRS would be receiving a check that would stop interest from running on the day the check was deposited. *See* Robbins Decl. ¶ 27; Stip. Facts ¶ 80.

25. On December 13, 1990, Kelly signed the notice of proposed adjustment relating to the RSI net operating loss and indicated his agreement by marking an "X" next to the word "Agreed" at the bottom of the form. *See* JE 16; Stip. Facts ¶ 76. That same day, "Amstar drew a check on its account in the amount of $6,497,710.00 made payable to the Internal Revenue Service." Stip. Facts ¶ 74. The stub attached to the check described the remittance as "Taxes due for Refined Sugars Inc. for short period return ending 8/22/89." JE 15; *see also* Stip. Facts. ¶ 75.

26. "On December 14, 1990, at the Staley offices in Decatur, Illinois, Twenty gave Robbins the notice of proposed adjustment, the $6,497,710.00 check, and a letter dated December 14, 1990, addressed to Robbins and written on Staley letterhead, that Twenty had signed" (the "Twenty Letter"). Stip. Facts ¶ 81.

27. The Twenty Letter states, in pertinent part:

Re: Amstar Sugar Corporation and Subsidiaries Notice of Proposed Adjustment # 1

Dear Ms. Robbins:

Enclosed is the above referenced Notice of Proposed Adjustment, executed by an officer of Amstar Sugar Corporation. The taxpayer has agreed to this adjustment and herewith encloses a check in the amount of $6,497,710 in payment of the deficiency in tax, plus interest, resulting from this adjustment. The tax was computed using the 34% statutory rate, and interest

has been calculated for the period from June 15, 1990 through December 14, 1990. **We respectfully request that this deposit be identified as a cash bond in your records.**

JE 19 (emphasis added); *see also* Stip. Facts ¶ 82.

28. Robbins "reviewed the documents . . . . [and] did not see anything wrong with the [Twenty Letter]." Robbins Decl. ¶ 28; *see also* Stip. Facts ¶ 83. She was not surprised that the remittance was identified as a cash bond because, among other things, Robbins and Carnie "had always discussed it in the form of a cash bond." Tr. at 221:25–222:1.

29. "As of December 14, 1990, the IRS had not assessed any deficiency in tax for Amstar's 8908 tax period, or mailed Amstar[ ] any notice(s) of deficiency for that tax period." Stip. Facts ¶ 93.

30. Based upon the foregoing, the Court concludes (finds) that Amstar (and the Tate & Lyle Group) intended the December 1990 remittance of $6,497,710.00 to be designated a cash bond in order to stop interest from running.

31. After receiving the executed notice of proposed adjustment, the Twenty Letter, and the $6,497,710.00 check, Robbins "drove from Decatur, Illinois to Springfield, Illinois so that the check could be deposited that day." Robbins Decl. ¶ 28. Robbins testified that she was "interested in getting [the check] posted to the taxpayer's account that very day, so that the interest stop[ped] running on December 14 when [the IRS] receive[d] the check." Tr. at 233:17–20.

32. Robbins instructed her secretary, Jan Babb ("Babb"), *see* Robbins Decl. ¶ 29, to "call [the] collection [depart-

ment] and find out how to have [the December 1990 remittance] posted as a cash bond." Tr. at 230:24–231:1.

33. Robbins intended the December 1990 remittance to be a cash bond, and she treated it as such. At trial, Robbins gave the following very credible testimony:

Q. So obviously I guess it was your understanding at the time that [the December 1990 remittance] was intended to be [a cash bond].

A. That was my understanding.

Q. And did you implement measures to treat [the check] as if it were a cash bond?

A. Well, it was my understanding that the paperwork was all initiated to reflect it as a cash bond.

*Id.* at 231:2–9.

34. The paperwork Babb prepared to process the December 1990 remittance contains indicia of both a cash bond and payment of tax. At the time Babb prepared the paperwork, she was new to her position in the Examination Division of the IRS. *See* Robbins Decl. ¶ 29.

35. "Babb prepared a Document Transmittal form to the IRS Collection Division numbered 91–004 transmitting the $6,497,710.00 Amstar check." Stip. Facts ¶ 101. On the Document Transmittal form, Babb typed the following: "Check in the amount of $6,497,710.00 for 1120/02 AMSTAR SUGAR CORP. AND SUBS. (Successor by merger to Refined Sugars, Inc.) EI # 13–3366163 for tax period 8908. CASH BOND_ Send 316(C)." *Id.* at ¶ 103; *see also* JE 20.

36. "Babb prepared a Payment Posting Voucher form 3244–A." *Id.* at ¶ 112. On the Payment Posting Voucher, Babb typed "Xs" in the boxes next to

the words "Cash Bond" and "Send 316(C)." *See id.* at ¶ 113. In the Transaction Data section of the Payment Posting Voucher, Babb typed the amount of the December 1990 remittance next to the words "Code 670" and "Subsequent Payment." *See id.* at ¶ 114. "The correct code for a deposit in the nature of a cash bond is 'Code 640,'" *id.* at ¶ 116, and "[t]he correct code for a subsequent payment of tax is 'Code 670.'" *Id.* at ¶ 117. A secondary "Code 570" is also required for a payment of tax. *See id.* at ¶ 118. "On the Payment Posting Voucher prepared to record Amstar's [December 1990] remittance there is a zero entered on the line for transaction code 570." *Id.* at ¶ 115.

37. A 316(C) letter "explains to a taxpayer the consequences of the IRS's treating [a] remittance as a deposit [in the nature of a cash bond]." *Id.* at ¶ 104. In most cases, the 316(C) letter is computer-generated. *See id.* at ¶ 138.

38. Neither Plaintiff nor Defendant presented conclusive evidence that a 316(C) letter was sent by the IRS or not received by Amstar or the Tate & Lyle Group.

39. "In the IRS's automated computer system, cash bonds are given a unique transaction code ...." *Id.* at ¶ 132. "IRS personnel use these transaction codes to determine what has happened in the taxpayer's account." *Id.* at ¶ 120. "The transaction code 670 was recorded in the IRS's computer record of Amstar's transcript to identify Amstar's remittance." *Id.* at ¶ 119.

40. Cash bonds are also assigned a unique Document Locator Number ("DLN") in the IRS's automated computer system within the blocking ser-

ies "999." *See id.* at ¶ 132. "The Payment Posting Voucher for Amstar's check was stamped with DLN number '3631734899900–0' . . . [which] is within blocking series '999." ' *Id.* at ¶¶ 133–34 (emphasis added).

41. Though Twenty has an MBA and "specialized in finance," Tr. at 102:14–15, he testified that he "wasn't a tax person." *Id.* at 107:1. Twenty also testified that he, as well as Amstar, wanted to get the December 1990 remittance to the IRS as quickly as possible so that interest would not continue to run. *See id.* at 127:8–128:4, 129:14–20. Robbins testified that Twenty "knew that [Amstar was] paying this money to stop the interest from running . . . ." *Id.* at 219:25–220:1.

42. It may readily be inferred that someone at Amstar, the Tate & Lyle Group, or (possibly) BM & M, advised Twenty to term the December 1990 remittance a "cash bond." Twenty asserted he did not know "[w]hat a cash bond payment is," *id.* at 130:6, and had never used the term "cash bond" before (or since) December 1990. *See id.* at 130:10–14. Twenty testified that he could not "have come to call [the December 1990 remittance] a cash bond unless somebody told [him] it was a cash bond." *Id.* at 130:23–25. He stated that he drafted the Twenty Letter "[w]ith a great deal of assistance," *id.* at 115:10, possibly from outside counsel, since Twenty consulted BM & M "on a regular basis." *Id.* at 107:14; *see also* Stip. Facts ¶ 52 ("Twenty used BM & M daily for tax advice.").

43. Twenty also testified that he believed he was "authorized to send [the Twenty Letter] to . . . Robbins," *id.* at 122:11–12; that "it was accurate," *id.* at 122:14; and that "wherever [he] got

the information from was a reliable source." *Id.* at 122:16–17. "[N]o one ever told [him] that the information in [the] letter was incorrect." *Id.* at 122:20–21 (emphasis added).

44. "Amstar never filed a Form 2848 Power of Attorney and Declaration of Representative with the IRS for . . . Twenty at any time prior to December 14, 1990." Stip. Facts ¶ 204.

45. On December 14, 1990, Hoyt faxed a copy of the Twenty Letter to Friedman at Amstar and James Hagerty, Esq. at BM & M. *See id.* at ¶¶ 86, 91. And, Kelly had a copy of the Twenty Letter in his files at Amstar, *see id.* at ¶ 87, and "did not think there was anything unusual about the letter." *Id.* at ¶ 88.

46. After December 14, 1990, Robbins "had multiple communications with [Twenty] both orally and in writing . . . . Hunter never told [Robbins] that the [December 1990] remittance was not a cash bond, or that Twenty did not have authority to designate it as a cash bond." Robbins Decl. ¶¶ 32, 33.

47. After December 1990, Robbins "continued to have many communications with the BM & M lawyers. No one from that firm ever told [her] that the [December 1990] remittance was not a cash bond, or that . . . Twenty did not have authority to designate it as a cash bond." *Id.* at ¶ 35.

48. In July 1991, Ann Harris ("Harris") succeeded Twenty as the Director of Taxes of the Tate & Lyle Group. *See* Deposition of Ann Harris, dated March 29, 2000 ("Harris Dep.") at 6:8–9, 7:12–21; Stip. Facts ¶ 147. Like Carnie and Twenty, Harris was an employee of Staley. *See* Harris Dep. at 6:6–7. She does not believe that

her duties were any different than those of Twenty. *See id.* at 8:12–14.

49. Amstar's 8908 return was not audited until in or about July 1992 (the "8908 Audit"). *See* JE 54.

50. In or about September 1993, the IRS concluded the 8908 Audit and found "an overpayment of tax [by Amstar] in the amount of $173,336.00." Stip. Facts ¶ 156. In fact, Amstar "did not have a deficiency in tax for the 8908 tax period." *Id.* at ¶ 157.

51. In or about September 1993, the IRS issued a Revenue Agent's Report ("RAR") "showing income tax changes to Amstar's 8908 return that were made after the conclusion of the IRS'[s] audit of the return." Declaration of Rosie L. Williams ("Williams"), dated April 24, 2002 ("Williams Decl."), ¶ 9; *see also* JE 31; Tr. at 250:15–24. Williams, a Team Manager for the IRS, *see* Williams Decl. ¶ 1. testified that, based on the Twenty Letter and the Payment Posting Voucher requesting cash bond treatment and indicating that a 316(C) letter should be sent, she "had every reason to think" that December 1990 remittance was a cash bond. *See* Tr. at 254:5–15. In preparing the RAR, Williams, on behalf of the IRS, intended in her "evaluation or analysis of [the December 1990 remittance] to treat it as a cash bond." *Id.* at 265:20–21.

52. On September 23, 1993, Lana Morell ("Morell"), a Restricted Interest Examiner with the IRS, *see* Stip. Facts ¶ 170, "prepared a Manual Refund Posting Voucher in connection with the Amstar 8908 return." *Id.* at ¶ 173. On September 28, 1993, "[t]he IRS issued a check in the amount of $8,240,206.34 payable to Amstar Sugar Corporation and subsidiaries ...." *Id.* at ¶ 184. The September 1993 check included: "(i) the $173,336.00 refund (minus $7,956.61, which was credited to other tax liabilities owed by Amstar), together with interest in the amount of $51,016.35; and (ii) the $6,497,710.00 [December 1990] remittance together with interest thereon in the amount of $1,526,100.60." Compl. ¶ 31; *see also* JE 99. The IRS's books and records characterize the September 1993 check as a "Refund of Overpayment." *See* Stip. Facts ¶ 187.

53. In September 1995, Roland Neumann ("Neumann"), an IRS agent, reviewed the file for Amstar's 8908 return and discovered that the IRS had paid interest to Amstar on the December 1990 remittance which was improper because the December 1990 remittance was a cash bond. *See id.* at ¶ 191.

54. On January 25, 1996, Williams informed Harris "that the IRS had mistakenly paid interest on the $6,497,710.00 remittance." *Id.* at ¶ 192.

55. On March 14, 1996, Harris sent Williams a memorandum (the "Harris Memorandum") on Staley letterhead which stated: "We did not then, and we do not now, consider the September 1993 refund to be a return of **the cash bond paid** for the erroneous use of the NOL carryforward. We believe [the] refund resulted from ... favorable adjustments and [Amstar] is entitled to the interest it received." JE 101 (emphasis added). "The 'we' in the Harris [M]emorandum ... referred to the Tate & Lyle [G]roup and Amstar." Stip. Facts ¶ 198. Thus, Defendant continued to describe the December 1990 remittance as a "cash

bond" more than five years after it was made.

56. The Government commenced this action against Tate & Lyle on December 10, 1997, *see id.* at ¶ 199, to recover the erroneous interest payment of $1,526,100.60 on the December 1990 remittance.

## III. Conclusions of Law

### *Jurisdiction and Venue*

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 ("the district courts shall have original jurisdiction of all civil actions ... commenced by the United States ....") and 26 U.S.C. § 7402(a) ("[t]he district courts ... at the instance of the United States shall have such jurisdiction ... to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws."). Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)-(c), because Defendant does business in this district. *See* Answer ¶ 4.

### *Burden of Proof*

■ 2. "[I]t is the government, rather than the taxpayer, that bears the burden of proof," *United States v. CSX Corp.*, 94 Civ. 773, 1995 WL 381537, at *3 (E.D.Va. May 8, 1995), by a preponderance of the evidence. *See Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The Court need only find "that the existence of [the] fact is more probable than its nonexistence." *Brown v. Warden, Great Meadow Correctional Facility*, 682 F.2d 348, 352 (2d Cir. 1982) (internal citations omitted).

### *The December 1990 Remittance*

■ 3. "An advance payment which is not assessed will be treated as a deposit made in the nature of a cash bond for the payment of taxes thereafter found to be due." Rev. Proc. 64–13, 1964–1 C.B. 674; *see also Rosenman*, 323 U.S. at 662, 65 S.Ct. 536. A deposit in the nature of a cash bond stops "the accrual of interest ... on [any] deficiency that [is] ultimately assessed ...." *Fier v. United States*, 01 Civ. 2225(JGK), 2002 WL 453177, at * 5 (S.D.N.Y. Mar. 25, 2002). Unlike a payment of tax, a deposit in the nature of a cash bond "is not subject to a claim for credit or refund [and, if the taxpayer requests it be returned before an assessment,] will be returned to the taxpayer, without interest ...." Rev. Proc. 84–58 at § 4.02(1).

4. The December 1990 remittance was a deposit in the nature of a cash bond. As a result, the IRS erroneously paid interest to Amstar on September 28, 1993—in the amount of $1,526,100.60—when it returned the December 1990 remittance.

■ 5. To determine whether a taxpayer remittance is a payment of tax or a cash bond, the United States Court of Appeals for the Second Circuit has developed the "facts and circumstances" test, which requires analysis of three factors: "(1) the timing of the assessment or definition of the tax liability; (2) the taxpayer's intent with respect to the remittance; and (3) the IRS's treatment of the remittance upon receiving it." *Ertman v. United States*, 165 F.3d 204, 207 (2d Cir.1999). The Court

must take into account "the unique facts and circumstances of each case." *Crosby v. United States*, 889 F.Supp. 148, 151 (D.Vt.1995).

6. "[A] taxpayer who makes a remittance before a tax liability has been ascertained [as here] is generally presumed to have intended to make a deposit." *Malachinski v. Comm'r of Internal Revenue*, No. 13501–94, 1999 WL 349342 (U.S.Tax Ct. June 1, 1999), *aff'd*, 268 F.3d 497 (7th Cir.2001).

### Timing of the Assessment or Definition of Tax Liability

7. Assessments of tax liability generally occur in three ways: "(1) automatically, after a return is filed showing a tax liability; (2) from a notice of deficiency; or (3) after an audit." *Crosby*, 889 F.Supp. at 151 n. 5. In this case, Amstar's tax liability for the period covered by the 8908 return had not been assessed at the time of the December 1990 remittance. *See* Stip. Facts ¶ 93. The 8908 return did not show a tax liability. *See* JE 1, 14a. Amstar elected not to file an amended return after discovering that it had erroneously taken a deduction for the RSI net operating loss. *See* Robbins Decl. ¶¶ 15–16. On December 14, 1990—the date Twenty remitted the check identified as a "cash bond" to the IRS— "the IRS had not assessed any deficiency in tax for Amstar's 8908 tax period, or mailed Amstar any notice(s) of deficiency for that tax period." Stip. Facts ¶ 93. And, the IRS did not audit the 8908 return until approximately July

1992. *See* JE 54. Thus, the timing factor under *Ertman* weighs in favor of finding that the $6,497,710.00 remittance was a deposit in the nature of a cash bond. *See Crosby*, 889 F.Supp. at 151; *see also* Rev. Proc. 84–58 at § 4.02(1).

### Amstar's Intent

8. The clearest indication of Amstar's intent is found in a series of factors including, but by no means limited to, the Twenty Letter accompanying the December 1990 remittance which states: "We respectfully request that this deposit be identified as a cash bond in your records." JE 19. The record is replete with other indicia of Amstar's intent (both before and after the December 1990 remittance) that the remittance was a cash bond, including: (i) the conversations between Robbins and Carnie (and later Robbins and Twenty) concerning the cash bond option and Amstar's and the Tate & Lyle Group's desire to stop interest from running on any tax liability that might result from the erroneous NOL deduction; (ii) the fact that no one at Amstar (or the Tate & Lyle Group) told the IRS after December 14, 1990 that Amstar did not want cash bond treatment, although Friedman, Amstar's Senior Tax Counsel, and BM & M (the Tate & Lyle Group's outside counsel whom Twenty consulted "daily" for tax advice) received a copy of the Twenty Letter on December 14, 1990. Kelly, an officer of Amstar, was also aware of the Twenty Letter and had a copy in his files;[7] and (iii) the fact

---

7. If Amstar did not agree with information or explanations provided to the IRS by the Tate

& Lyle Group tax department, Amstar would bring that disagreement to the attention of the

that, even when Defendant refused to return the interest payment on March 14, 1996, Harris referred to the December 1990 remittance as "the cash bond" and did not dispute that the December 1990 remittance was intended to be a cash bond. *See* JE 101 ("We did not then, and we do not now, consider the September 1993 refund to be a return of the cash bond paid for the erroneous use of the NOL carryforward. We believe [the] refund resulted from ... favorable adjustments and [Amstar] is entitled to the interest it received.").

9. Twenty possessed the authority to bind Amstar, under one or more of the theories advanced by the Government: actual authority, apparent authority, and ratification. *See* Plaintiff's Post Trial Proposed Findings of Fact and Conclusions of Law ("Pl.Prop.Findings"), dated July 9, 2002, at 16. "The liability of the principal to a third person upon a transaction conducted by an agent, or the transfer of his interests by an agent, may be based upon the fact that: (a) the agent was authorized; (b) the agent was apparently authorized; or (c) the agent had a power arising from the agency relation and not dependent upon authority or apparent authority." Restatement (Second) of Agency § 140 (1958).

10. "Actual authority is created by direct manifestations from the principal to the agent ...." *Peltz v. SHB Commodities, Inc.,* 115 F.3d 1082, 1088 (2d Cir.1997) (internal quotation marks omitted); *see also* Restatement (Second) of Agency § 26 Tate & Lyle Group tax department. *See* Stip. Facts ¶ 90. There is no evidence that oc-

(1958) (actual "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.") Twenty, the Director of Taxes for the Tate & Lyle Group, testified that Amstar "authorized" him to "lia[ise] with the IRS," Tr. at 99:4–5, which authorization included, among other things, conferring with Robbins and sending the Twenty Letter and the December 1990 remittance to Robbins. *See id.* at 99:7–10, 122:10–18. Indeed, Twenty sought Amstar's "preapproval of anything that [he] did on [Amstar's] behalf with the IRS," *id.* at 104:3–4, and made "no decisions for Amstar." *Id.* at 104:8. Amstar conferred actual authority on Twenty to designate the December 1990 remittance as a cash bond, despite the fact that no power of attorney was signed by an officer of Amstar giving Twenty authority to act for Amstar. *See* Defendant's Post–Trial Proposed Findings of Fact and Conclusions of Law ("Def.Prop.Findings"), dated July 10, 2002, at 13; *see also* 26 C.F.R. § 601.502(c) (1990).

11. Rev. Proc. 84–58, which allows taxpayers to make deposits in the nature of a cash bond to toll the accrual of interest, is silent as to any specific procedures for making a cash bond and nowhere indicates that a power of attorney is required for a taxpayer representative to curred here.

designate a remittance a cash bond. *See* Rev. Proc. 84–58.

12. And, even assuming *arguendo* that Twenty did not have actual authority, he had apparent authority. "[A]pparent authority depends on some conduct by the principal, communicated to a third party, which reasonably gives the appearance that the agent has authority to conduct a particular transaction." *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales,* 235 F.3d 738, 748 (2d Cir.2000); *see also* Restatement (Second) of Agency § 27 (1958). "[A] principal may be bound by a person's actions if the principal conducts himself in a manner that leads a third party to believe that the purported agent possesses authority." *Reiss,* 235 F.3d at 748. The IRS bears the burden of proving that "(1) the principal was responsible for the appearance of authority in the agent to conduct the transaction in question, and (2) the third party reasonably relied on the representations of the agent." *Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 993–94 (2d Cir. 1991) (internal citations omitted). Amstar's and the Tate & Lyle Group's words and conduct gave Twenty the appearance of authority to deal on tax issues with the IRS. After Carnie left and Twenty was appointed Director of Taxes, Hunter informed the IRS that it should direct all audit issues to Twenty.[8] *See* Robbins Decl. ¶ 21. Robbins testified that Twenty was the IRS's primary contact, just as Carnie was before him, on behalf of Amstar and the other entities within the Tate & Lyle Group. *See id.* at ¶ 25. Friedman, Amstar's 'Senior Tax Counsel, confirmed that Amstar had no direct contact with the IRS and that the Tate & Lyle Group had decided that the Staley tax department would act as Amstar's representative with the IRS. *See* Friedman Dep. at 72:22–73:15. After Twenty became Director of Taxes, attorneys for BM & M informed the IRS that " 'Hunter and ... Twenty were in control' of the audit issues." Robbins Decl. ¶ 22. After the December 1990 remittance was made, Robbins continued to communicate with Twenty, attorneys from BM & M, and Hoyt, *see id.* at ¶¶ 32, 35–36, and "no one at Amstar ever told [Robbins] that the remittance was not a cash bond, or that ... Twenty did not have authority to designate it as a cash bond." *Id.* at ¶ 37.

13. And, assuming *arguendo* that Twenty possessed neither actual nor apparent authority, Defendant ratified Twenty's acts. "Ratification is the express or implied adoption of acts of another by one for whom the other assumes to be acting but without authority." *Prisco v. New York,* 804 F.Supp. 518, 523 (S.D.N.Y. 1992). These acts are "given effect as if originally authorized by [the principal]." Restatement (Second) of Agency § 82 (1958). "Ratification may be express, as by spoken or written words, or it

---

**8.** Robbins had many conversations with Carnie, Twenty's predecessor as Director of Taxes, about the possibility of a cash bond deposit to stop interest from running and came to believe that Carnie, after consulting with Amstar, desired to remit a cash bond. *See* Tr. at 211:9–18, 213:6–15, 217:4–218:2.

may be implied from any act, words, or course of conduct on the part of the principal which reasonably tend to show an intention to ratify the unauthorized ... act." *Capital Dist. Physician's Health Plan v. O'Higgins,* 951 F.Supp. 352, 361 (N.D.N.Y.1997) (citation and internal quotation marks omitted). Amstar adopted Twenty's designation of the December 1990 remittance as a cash bond. On December 14, 1990, Hoyt faxed a copy of the Twenty Letter to Friedman, Amstar's senior tax counsel, and the attorneys at BM & M. *See* Stip. Facts ¶¶ 86, 91. A copy of the Twenty Letter was also found in the files of Kelly, Amstar's treasurer. *See id.* at ¶ 87. "In the days and weeks after December 14, 1990, Twenty and the BM & M attorneys communicated with the IRS." *Id.* at ¶ 144. Yet, no one at Amstar (or the Tate & Lyle Group or BM & M) ever informed the IRS until after the IRS commenced this action that Amstar did not intend to submit a cash bond; that the Twenty Letter was incorrect; or that Twenty did not have the authority to designate the remittance a cash bond. **The Harris Memorandum dated March 14, 1996 continues to refer to the December 14, 1990 remittance as "the cash bond."** *See* JE 101.

14. The effect of Amstar's acts, words, and course of conduct, by a preponderance of the evidence, is an intention to treat the December 1990 remittance as a cash bond, to stop interest from running, and to ratify Twenty's designation of the December 1990 remittance as a cash bond.[9]

### IRS's Treatment of the December 1990 Remittance

15. The IRS and Robbins treated the December 1990 remittance as if it were a cash bond. Robbins discussed a cash bond with both Carnie and Twenty. Upon receiving the December 1990 remittance from Twenty, Robbins drove to Springfield, Illinois in order to get the check "posted to the taxpayer's account that very day, so that the interest stop[ped] running on December 14," Tr. at 233:18–19, which is the purpose of a cash bond. She also instructed her secretary to prepare a Payment Posting Voucher for the remittance as a cash bond the "very day" Robbins received the check. *See id.* at 232:17–25. Robbins testified (very credibly) that she intended the remittance be processed as a cash bond. *See* Tr. at 231:2–9. When Williams prepared the RAR, she treated the remittance as a cash bond. *See id.* at 265:19–266:22; *see also* JE 31. And, the IRS assigned the December 1990 remittance a DLN number within blocking series 999, indicating cash bond treatment. *See* Stip. Facts ¶¶ 133–34. Because the Payment Posting Voucher may be read to contain (limited) indicia of both a cash bond (*i.e.,* the box checked "Send 316(C)") and payment of tax (*i.e.,*

---

9. This is evident notwithstanding Defendant's argument that Amstar "acted contrary to making a deposit in the nature of a cash bond on at least two occasions ... [by] deduct[ing] the interest it paid on the remittance [and] fil[ing] a refund claim requesting return of its remittance." Def. Prop. Findings at 15.

use of the 670 transaction code), the voucher itself "supports either the payment or deposit interpretation, and accordingly it is not persuasive as to either." *Malachinski,* 1999 WL 349342, at n. 4.

### Statute of Limitations

■ 16. A six year statute of limitations applies here, and the suit is timely. "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute." *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938) (citation and internal quotation marks omitted); *see also Bechtel v. Pension Benefit Guar. Corp.,* 781 F.2d 906, 907 (D.C.Cir.1985) ("The government's right to recoup funds owing to it is beyond dispute ...."). "The Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has clearly manifested its intention to raise a statutory barrier." *Wurts,* 303 U.S. at 416, 58 S.Ct. 637 (internal quotation marks omitted).[10]

17. Because the Court has concluded that the December 1990 remittance was a deposit in the nature of a cash bond, and because it is well-settled that interest does not accrue on a cash bond. Amstar was unjustly enriched by the $1,526,100.60 interest payment. "Such an action for unjust enrichment is based on a quasi-contract, which is synonymous with a contract implied in law." *United States v. Michigan,* 851 F.2d 803, 810 (6th Cir.1988) (citation and internal quotation marks omitted) (applying six-year statute of limitations to action brought by United States to recover state sales tax erroneously paid by federal credit unions); *see also United States v. Dekalb County,* 729 F.2d 738, 741 (11th Cir.1984) (holding that action by United States to recover taxes paid erroneously "sounded in *quasi-contractus* for the recovery of its treasury funds paid by mistake which resulted in the unjust enrichment of the county"); *United States v. Limbs,* 524 F.2d 799, 802 n. 3 (9th Cir.1975) (stating that Congress intended § 2415(a) "to include quasi-contracts involving unjust enrichment wherein the debtor receives money from the Government to which he is not entitled, regardless of whether the payment

**10.** Defendant contends that this action is barred by the two-year statute of limitations set forth in 26 U.S.C. § 6532(b). *See* Def. Prop. Findings at 18. Section 6532(b), entitled "Suits by United States for recovery of erroneous refunds," provides, in pertinent part: "Recovery of an erroneous refund by suit under [26 U.S.C. § 7405] shall be allowed only if such suit is begun within 2 years after the making of such refund ...." 26 U.S.C. § 6532(b). The Government argues that this action is governed by the six-year statute of limitations established by 28 U.S.C. § 2415. *See* Pl. Prop. Findings at 19. Section 2415, entitled "Time for commencing actions brought by the United States," provides, in pertinent part: "[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues ...." 28 U.S.C. § 2415(a).

is made pursuant to agreement or as a gratuity"). This action, seeking recovery of interest erroneously paid on a cash bond, is a quasi-contractual claim which the Government timely instituted within six years. *See* 28 U.S.C. § 2415(a).

## IV. Interest

■ 1. "[W]hen a federal statute is silent concerning the availability of pre-judgment interest, a court may award prejudgment interest in accord with its equitable discretion." *Rao v. New York City Health and Hosps. Corp.*, 882 F.Supp. 321, 325 (S.D.N.Y.1995). Furthermore, "[a] district court has wide discretion in determining a reasonable date from which to award prejudgment interest." *Nat'l Communications Ass'n, Inc. v. Am. Tel. & Tel. Co.*, 92 Civ. 1735(LEP), 1999 WL 258263, at *6 (S.D.N.Y. Apr. 29, 1999). A discretionary award of prejudgment interest is premised "on the need for full compensation and fairness under the circumstances . . . ." *Wickham Contracting Co., Inc. v. Local Union No. 3. Int'l Bhd. of Elec. Workers, AFL–CIO*, 955 F.2d 831, 836 (2d Cir.), *cert. denied*, 506 U.S. 946, 113 S.Ct. 394, 121 L.Ed.2d 302 (1992); *see also West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987).

2. "Postjudgment interest is designed to compensate the plaintiff for the delay it suffers from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir.1994).

3. The Court would like the parties to submit (short) supplemental letter briefs on the issue of interest, including whether it should be awarded and, if so, in what amount(s).

## V. Conclusion and Order

For the foregoing reasons, the Court determines that the December 1990 remittance was a deposit in the nature of a cash bond. **Prior to entry of judgment and on or before September 4, 2002, the parties are directed (simultaneously) to serve and file supplemental letter briefs (5 pages or less, double-spaced) on the issue(s) of interest, including, without limitation, whether it should be awarded and, if so, in what amount(s).**

### *ORDER*

This action having come on for trial before the Court, and the evidence adduced by the parties having been heard, and the Court having made and filed its Findings of Fact and Conclusions of Law, dated August 28, 2002, and upon consideration of the supplemental letter briefs filed by the parties on the issue of interest, it is

ORDERED, ADJUDGED AND DECREED that the plaintiff, the United States of America, recover of the defendant Tate & Lyle North American Sugars, Inc., the sum of: One Million Five Hundred Twenty–Six Thousand One Hundred Dollars and Sixty Cents ($1,526,100.60).

■ In consideration of the factors set out in *Wickham Contracting v. Local Union No. 3, IBEW, Int'l Bhd. of Elec. Workers, AFL–CIO*, 955 F.2d 831 (2d Cir.1992), and pursuant to this Court's equitable discretion, the plaintiff shall be awarded prejudgment interest at the rate set forth in 28 U.S.C. § 1961. *See Nat'l Communications Assn., Inc. v. AT & T*, No. 92 Civ. 1735(LAP), 1999 WL 258263 at *6 (S.D.N.Y. Apr.29, 1999).

Interest shall be calculated by the Clerk of the Court pursuant to the provisions of

28 U.S.C. § 1961 for the period September 28, 1993 to the date of this judgment. *See Id.* at *6 ("Under federal law interest begins to accrue from the time of the injury.")

Postjudgment interest on such aggregated amount shall commence seven (7) days from the date of this judgment at the rate specified in 28 U.S.C. § 1961. Plaintiff is entitled to execution of this judgment against defendant.

### ORDER

The Clerk is respectfully requested to enter Judgment for the plaintiff forthwith and calculate interest in accordance with this order and, thereafter, to close this case.

### SUPPLEMENTAL ORDER

On or about August 28, 2002, the Court made and filed its Findings of Fact and Conclusions of Law in this action. By Order, dated September 20, 2002, the Court directed the Clerk to enter judgment for the plaintiff, the United States of America, and calculate prejudgment interest pursuant to 28 U.S.C. § 1961. Having reviewed the plaintiff's letter dated September 23, 2002 and the defendant's letter dated September 24, 2002, the Court directs that in calculating the pre-judgment interest award, the Clerk use the average of the Treasury bill rate for the period for which pre-judgment interest has been awarded. *See Rao v. New York City Health and Hosps. Corp.*, 882 F.Supp. 321, 328 (S.D.N.Y.1995) ("To account fairly for the considerable fluctuations in the Treasury bill rate, it is appropriate to calculate prejudgment interest according to the average rate over the period for which interest is to be awarded.")